**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **CRIMINAL ACTION** |
| *v.* | **NO. 23-127-KSM** |
| **SALLIEU MANSARAY** | |

<u>**MEMORANDUM**</u>

**Marston, J.**                                                          **May 20, 2024**

The issue presently before the Court is whether Defendant Sallieu Mansaray is competent to stand trial for his alleged crimes of dealing in firearms without a license and making false statements to a federal firearms licensee. Defendant takes the position that he is competent to stand trial, whereas the Government argues that Defendant is currently incompetent and should be committed to the custody of the Attorney General to have his competency restored pursuant to 18 U.S.C. § 4241(d). Following a two-day competency hearing and after careful consideration of the parties' briefing, the detailed forensic evaluation drafted by Dr. Priyanka Rao and Dr. Robin Watkins of the Bureau of Prisons, medical records obtained from the Federal Detention Center in Philadelphia, and other documents provided by the parties, the Court finds that Defendant is competent to stand trial for the reasons set forth herein.

## I.     Background

Defendant Sallieu Mansaray, a twenty-four-year-old man, was federally indicted on March 28, 2023 with one count of dealing in firearms without a license in violation 18 U.S.C. § 922(a)(1)(A), 924(a)(1)(D) and 2, seven counts of making false statements to a federal firearms licensee in violation of 18 U.S.C. § 924(a)(1)(A), and aiding and abetting in violation 18 U.S.C.

1

§ 2.  (Doc. No. 1.)  However, to provide a full picture of the issue before the Court, we must first examine incidents which took place before the federal grand jury returned this indictment.

### A.  Defendant's Arrest, Arraignment, and Initial Issues

On March 31, 2022, about one year before Defendant's federal indictment, a Protect from Abuse Order was entered against Defendant in relation to his former girlfriend due to an incident in the fall of 2021.  (Doc. No. 8 at 6; April 18, 2024 Letter Brief from Assistant Federal Defender Jonathan McDonald ("Def. Letter Brief") at 1.)  Nearly a year later, on February 22, 2023, Defendant violated that Protect from Abuse Order, and was thereafter arrested and charged in Delaware County Court of Common Pleas with one count of contempt for violation of an order or agreement.  *See Commonwealth v. Mansaray*, CP-23-MD-0000726-2023 (C.C.P. Del. Cnty).  At his arraignment for these charges, the state court imposed bail and ordered a mental health evaluation, which was conducted by Ms. Gabrielle Jeffers and Dr. O'Neill at the Department of Diagnostic Services.  (Def. Letter Brief at 2; March 20, 2024 Forensic Evaluation Report ("Rpt.") at 5.)  On March 13, 2023, the evaluators submitted their report, which concluded that Defendant met the criteria for "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder."  (Def. Letter Brief at 2; Rpt. at 6.)  On March 24, 2023, Defendant's bail was modified to include a condition for inpatient mental health treatment.  (Def. Letter Brief at 2; Doc. Nos. 8, 12.)

On March 28, 2023, while Defendant was in state custody at the George W. Hill Correctional Facility (Doc. No. 8), a federal grand jury returned the instant indictment (Doc. No. 1).  A bench warrant and a writ of habeas corpus *ad prosequendum* were issued that day.  (Doc. Nos. 3, 4.)  Two days later, on March 30, 2023, Defendant made his initial appearance and was temporarily detained.  (Doc. No. 6.)   Defendant was then arraigned on April 7, 2023 before

Magistrate Judge Scott W. Reid.  (Doc. No. 11.)  Judge Reid denied the Government's motion for pretrial detention and permitted Defendant to be released on $50,000 unsecured bond with certain conditions, including that Defendant participate in "mental health treatment/counseling as directed by the Delaware County Courts" in his state criminal matter discussed above, and participate in location monitoring.[1]  (Doc. Nos. 11, 12, 13.)  Defendant was thereafter returned to state custody.

In accordance with his local bail conditions, Defendant was transferred to Geo Serenity, the inpatient location designated by the state court, on June 13, 2023.  (Doc. No. 21.)  However, once there, Defendant "refused to comply with program rules." (*Id.*)  In particular, Defendant "refused [to] complete necessary intake paperwork and group therapy assignments, participate in therapeutic groups, or follow directives." (*Id.*)  He was also reported to be "disrespectful and verbally abusive towards staff." (*Id.*)  Just three days after being transferred, on June 16, 2023, Defendant was discharged from Geo Serenity and returned to George W. Hill for failure to meet his bail conditions. (*Id.*)  Because the failure to comply with his local bail condition of inpatient treatment was also a violation of his federal pretrial release conditions, a federal bench warrant was issued and lodged as detainer on June 16, 2023. (*Id.*)

On July 17, 2023, the Court held an in-person status conference with both counsel and Defendant.  (Doc. No. 27.)  The Court learned that Defendant's state court custody would end in August of 2023, after which Defendant would be transferred to federal custody.  Defense counsel also reported that he was working to schedule a mental health evaluation for Defendant.  The Court scheduled a follow-up status conference for September 7, 2023.  (Doc. No. 29.)

---

[1] On April 28, 2023, Defendant's release order in the Court of Common Pleas of Delaware County was amended to include electronic monitoring as well.  (Doc. No. 20.)

In late August 2023, Defendant was transferred to the Federal Detention Center in Philadelphia ("FDC Philadelphia").  (Def. Letter Brief at 2; Bureau of Prisons Psychological Records from April 17, 2023 to April 2, 2024 ("Psych. Records") at 209–15.)  Soon after arriving at FDC Philadelphia, Defendant was observed demonstrating "odd" behavior in his cell, such as throwing items and yelling.[2]  (Rpt. at 6; Psych. Records at 214–15.)  Defendant was seen for a suicide risk assessment and subsequently placed on suicide watch.  (Rpt. at 6–7; Psych. Records at 214–15.)  While on suicide watch, Defendant was documented demonstrating additional odd behavior such as "hiding behind his bed, yelling at inmate companions, pacing around his cell naked, talking to himself, and throwing items in the cell such as blankets and food trays."  (Rpt. at 7; Psych. Records at 203.)

On August 24, 2023, Defendant was removed from suicide watch and placed on Psychological Observation as a step-down procedure until he had demonstrated improved stability.[3]  (Rpt. at 7; Psych. Records at 202.)  But Defendant continued to demonstrate aggressive behavior and delusional ideations.[4]  (Rpt. at 7–8; Psych Records at 54, 56.)  Around this time, Defendant's family and attorney reported that they were unable to get in touch with him and that he was not permitted to leave his cell while under Psychological Observation.  (Doc. No. 35 at ¶ 4; Def Letter Brief at 2.)  This issue culminated on August 25, 2023 when

---

[2] The Court notes that in August of 2023, around the time that Defendant was engaging in this behavior, Defendant alleges he was sexually assaulted by another inmate.  (Psych Records at 6–9.)  Defendant did not report this sexual assault until March 14, 2024, after he returned to FDC Philadelphia.  (*Id.*)

[3] During this Psychological Observation, Defendant was diagnosed by FDC Philadelphia staff with "Unspecified Schizophrenia and Other Psychotic Disorder."  (Rpt. at 7; Psych Records at 215.)

[4] Beginning in August and continuing through December 2023 when Defendant was transferred to Metropolitan Correctional Center Chicago, FDC Philadelphia documented a number of Defendant's delusional ideations, including believing that he was a quarterback for the Philadelphia Eagles, a radio show host, and a music artist.  (Rpt. at 7–8; Psych Records at 56.)  Defendant was also placed in the SHU for portions of his detainment at FDC Philadelphia for fighting with another person, engaging in sexual acts, and refusing to obey an order.  (Rpt. at 8.)

defense counsel attempted to meet with Defendant to obtain a waiver of his right to a speedy trial in support of his motion to continue trial, but was unable to do so.  (Doc. No. 31.)  Then, on September 7, 2023, the date of his previously scheduled hearing, the U.S. Marshals' office reported that Defendant refused to leave his cell to be transported to the courthouse.  The Court thus rescheduled its status hearing to September 11, 2023.  (Doc. No. 35 at ¶ 4.)

On September 11, 2023, Defendant was transported to the courthouse by the U.S. Marshals to attend the rescheduled status hearing.  (*Id.* at ¶ 5.)  After meeting with his counsel in the cell room, the Marshals attempted to place him in handcuffs to bring him up to the courtroom.  (*Id.*)  This resulted in Defendant becoming "verbally hostile, physically aggressive," and unwilling to leave his cell.  (*Id.*)  The Court attempted to hold the status conference in the Marshals' Office, but once there, Defendant was observed in an "extremely agitated state."  (*Id.*) After "determining that Defendant was unable to attend the conference without creating a significant disturbance to the proceedings or causing harm to himself or others," the Court held the status conference with counsel, only.  (*Id.*)  The following day, on September 12, 2023, counsel submitted a joint motion seeking a competency evaluation pursuant to 18 U.S.C. § 4241(b) (Doc. No. 34), which the Court granted that same day (Doc. No. 35).

### B.  Defendant's Evaluation and Report

Defendant was then transferred to Metropolitan Correctional Center Chicago ("MCC Chicago") for a psychological evaluation, arriving on December 22, 2023.  (Rpt. at 1.)  Once there, Defendant was examined by Forensic Postdoctoral Fellow Doctor Priyanka Rao, and Supervising Forensic Psychologist Doctor Robin Watkins.  (Rpt. at 1.)  After the Court provided an extension of time, Defendant's examination concluded on February 5, 2024.  (Doc. 36.)  On

February 21, 2024, Defendant was transferred back to FDC Philadelphia, where he remains today.  (Psych. Records at 24.)

On March 20, 2024, the Court received Dr. Rao's comprehensive report, which detailed Defendant's behavior while at MCC Chicago.  The report noted that in the first few weeks after he arrived for his evaluation, Defendant engaged in "bizarre and inappropriate" behavior[5] that resulted in his placement in the Special Housing Unit (SHU).  (*Id.* at 11–12.)  However, Defendant's behavior improved once he was released to general population in January of 2024.  (*Id.* at 17.)  The report noted that while Defendant was generally "cooperative[,] engaged, and pleasant during the evaluation process," he was also "slightly guarded," with a tendency to provide responses that he thought were "socially desirable."  (*Id.* at 10.)

Based on Defendant's observed behaviors and collateral documents, the evaluators diagnosed Defendant with the following:

- Other Specified Personality Disorder, Antisocial Features (insufficient symptoms)
- Other Specified Schizophrenia Spectrum and Other Psychotic Disorder (insufficient symptoms)
- Other Specified Depressive Disorder, insufficient symptoms (by history)

(*Id.* at 18–19.)  The report stated that Defendant's prognosis for these diagnoses is "judged to be good with compliance to treatment recommendations."  (*Id.* at 19.)  This includes the consistent taking of the antipsychotic medication Abilify, which Defendant was prescribed during his first stay at FDC Philadelphia.  (*Id.*)  At the time of his evaluation, Defendant's medication compliance was concerning.  (*Id.* at 14–15; *see also* Apr. 9, 2024 Rough Hr'g Tr. at 32:2–5 (Dr.

---

[5] For example, on December 27, 2023, Defendant tried to grab the housing unit officer's hand to see her nails, approached that officer's desk despite being told to remain in his cell, and when returning to his cell, became overly aggressive, yelling at the officer's station.  (Rpt. at 11.)  The next day, Defendant handed the housing unit officer a piece of paper saying, "are you coming so we can fuck?"  (*Id.*)  Defendant was also observed engaging in conversations with an individual who he claimed was in the wall that owed him money and occasionally banged his head on the security enclosure.  (*Id.* at 11, 14.)

Rao testifying that one of the overarching concerns regarding Defendant's competence is his medication compliance).)  While at MCC Chicago, Defendant took his medication 58% of the time during the month of January 2024 and just 16% of the time during the month of February 2024.  (Rpt. at 15.)  The report thus recommended, among other things, "that [Defendant] comply with his currently prescribed psychotropic regimen or consult with a psychiatrist to assess for the appropriateness of another antipsychotic medication with which he would be more likely to comply."  (*Id.* at 19.)

Turning specifically to the issue of whether Defendant is competent to stand trial, Dr. Rao concluded that Defendant "demonstrated adequate factual understanding" regarding "the nature and consequences of his charges."  (*Id.* at 21.)  Dr. Rao specifically recounted that when Defendant was "asked to name his charges, he stated, '922-gun charges'" and that when provided his indictment to review, he was able to recall his charges after a brief time delay.  (*Id.*)  Defendant also showed a general understanding of the potential punishments he could face if he were convicted, stating that he "may be sentenced to a federal prison" and that his lawyer had told him that his sentence would be between 24–36 months.  (*Id.*)  And when educated on additional potential penalties he could face, Defendant recalled during a follow-up interview that he could be subjected to a fine and supervised release.  (*Id.*)  Defendant was similarly observed "accurately describ[ing] the nature of his charges" and potential sentences during a phone call with a friend.  (*Id.* at 13, 21.)

Dr. Rao also concluded that that Defendant "demonstrated an adequate degree of factual understanding of basic court-related information" and "a foundational ability to discuss abstract elements of court, including the adversarial nature of the setting, and the pros and cons of a defendant testifying in their own trial."  (*Id.* at 22, 24.)  His understanding was certainly

imperfect and variable, as he struggled with certain concepts such as "not guilty by reason of insanity." (*Id.* at 21–22.) But he was able to explain, in general terms, the role of defense counsel, the prosecution, the Judge, and after education, the role and size of a jury. (*Id.* at 22.) Defendant was also able to explain what witnesses and evidence are and, although wavering on his answers initially, understood what testimony was and his obligations and rights in connection with his own testimony. (*Id.*) Regarding the planning of legal strategies, Defendant defined a plea bargain as "a one-on-one deal with the prosecutor," and was able to discuss the circumstances in which he would consider different pleas in court. (*Id.*) And when Defendant was presented "a brief vignette that described a hypothetical crime," he "appropriately identified the evidence in the scenario, decision making approaches based on plea deals, and the likely outcome of the case." (*Id.* at 24.) The report concluded that these responses "conveyed an understanding, reasoning, and appreciation of competency-related abilities." (*Id.*)

Regarding the facts underlying his case, Dr. Rao reported that Defendant was able to provide "details about the timeline of events leading up to his arrest that were very consistent with information documented within legal records." (*Id.* at 23.) She further observed that Defendant "did not appear to endorse any problems with the recollection of what occurred as he was able to provide the events in a linear manner" and that he would be able "to testify relevantly, should he choose to do so." (*Id.*)

Defendant also reported to Dr. Rao that he had trust and confidence in his attorney's abilities and had no "apprehension with disclosing any information to his attorney." (*Id.* 23–24.) Defendant "expressed an intention to cooperate and work with his counsel and reported some ways he can problem solve when faced with a disagreement." (*Id.* at 24.) According to Dr. Rao,

Defendant appeared to understand that if he had issues within the courtroom or thought the testimony provided against him was dishonest, he should consult with his attorney. (*Id.* at 23.)

Despite these findings, Dr. Rao concluded that Defendant "appeared to lack the capacity to meaningfully assist his attorney and relay pertinent and relevant information as it relates to his case." (*Id.* at 24.) In particular, the report concluded that Defendant evidenced difficulty "engaging in a focused and relevant discussion regarding his case without periods of interruption and perseveration on his release." (*Id.*; *see also id.* at 13 (Dr. Rao noting that Defendant had a tendency to provide "odd and irrelevant responses" during interviews).) Dr. Rao also noted that while Defendant "demonstrated a foundational understanding of abstract concepts after being educated, he did not appear able to apply the information to his own circumstances. Rather, when asked about his case, he expressed a belief that he was waiting for his bail to be posted so that he would be released." (*Id*. at 24.)[6] Thus, Dr. Rao concluded that Defendant was not competent to stand trial. (*Id.* at 24–25.) The report noted, however, that these impairments were not "grossly debilitating" and that "[i]f Mr. Mansaray establishes full medication compliance, . . . he could be restored to competency within a reasonable period of time." (*Id.* at 25.)

### C. Post-Evaluation Behavior

The Court later received documentation setting forth Defendant's behavior and medication compliance following his arrival back to FDC Philadelphia in late February 2024. As to his behavior, Defendant was immediately placed on Psychological Observation when he arrived to the FDC Philadelphia due to his previous "challenges." (Psych Records at 26.)

---

[6] As discussed in more detail below, Defendant's misunderstanding regarding bail may be reasonably attributed to the complex procedural history of his case in which the conditions for his pretrial release with regard to his federal charges mirrored his bail conditions in state court. *See infra* at 9 n.7. It may also be attributed to his conversations with defense counsel in which Defendant was informed that if competent, he could move for pretrial release, and communications with his mother in which she informed him that, if competent, he would be released. *See id.*

However, he was removed from Psychological Observation just one week later, because he had been "calm and refrained from disruptive behaviors." (*Id.* at 12.) Since returning to FDC Philadelphia, there have been no documented instances of Defendant engaging in problematic behavior such as headbanging or delusion ideations. Instead, outside of two instances in which Defendant appeared to endorse auditory and visual hallucinations shortly after he returned to FDC Philadelphia (*id.* at 12, 16 (noting that on February 26, 2024 and February 28, 2024 Defendant engaged in such behavior)), Defendant has been described as "functioning well on a daily basis" (*id.* at 2, 4, 10, 11). As prison staff have detailed, Defendant "appears to have no difficulties following unit rules and procedures. He has received no recent incident reports. Staff have expressed no concerns about the [his] recent behavior . . . [and] [h]e appears to be socializing appropriately with peers." (*Id.*) His thought processes were also described as "logical and goal directed." (*Id.*; *see also* Apr. 9, 2024 Draft Hr'g Tr. at 35:9–15 (Dr. Rao testifying that Defendant is reportedly communicating with staff in a rational manner).)

As to his medication compliance, the records provided to the Court reflect improvement relative to Defendant's time at MCC Chicago. In February of 2024, after being transferred back to FDC Philadelphia, Defendant took his medication six out of seven opportunities (86%). (Bureau of Prisons Medication Administration Record as of April 23, 2024 ("Medication Records"), at 5.) Then, in March of 2024, Defendant took his medication sixteen times across thirty-one days (52%), which is roughly the same as his highest compliance rate while being examined by Dr. Rao. (*Id.* at 6.) And finally the most recent records reflect that in April of 2024 Defendant took his medication eighteen out of twenty-two opportunities (82%), including one day in which Defendant specifically asked the staff if he could be provided the medication after

missing the morning dosage due to his court hearing.  (*Id.* at 7; Psych Records at 1.)  Taken together, since returning to FDC Philadelphia, Defendant's medication compliance rate is 67%.

### D. Competency Hearings

The Court held a competency hearing on April 2, 2024.  (Doc. No. 38.)  During this hearing, the parties stipulated to the findings in Dr. Rao's report but disagreed as to its conclusion, with defense counsel taking the position that Defendant is competent and the Government arguing that he should be committed to the custody of the Attorney General to have his competency restored, as recommended by Dr. Rao.  (Apr. 2, 2024 Hr'g Tr. at 2:20–3:15.) Defendant was questioned by defense counsel, the Government, and the Court as to, among other things, the nature of his charges, the possible punishment he would face, whether he had been taking his medication consistently, and his occasionally irrational behavior while in custody.  (*Id.* at 5:5–14:5.)  Defendant testified that understood he was charged with straw purchasing (*id.* at 5:19–23), that he believed his sentencing guideline range is 24–36 months with a maximum sentence of 40 years (*id.* at 6:13–20), that he had been compliant with taking his medication (*id.* at 6:22–7:10)[7], and that he previously worked through discovery with his lawyer (*id.* at 6:1–7). Following argument from counsel, the Court continued the hearing so that Dr. Rao could testify and the Court could receive updated records from FDC Philadelphia regarding Defendant's current behavior and medication compliance.  (*Id.* at 20:17–21:11.)

The continuation of the competency hearing occurred on April 9, 2024.  (Doc. Nos. 39, 44.)  Dr. Rao appeared via Zoom and answered questions from counsel and the Court regarding her report and her analysis of additional records related to Defendant's behavior and medical

---

[7] Defendant's testimony that he has consistently been taking his medication is at odds with the records from FDC Philadelphia and MCC Chicago, which as discussed above, showed a lower compliance rate. *See supra* at Section I.B.

compliance since returning to FDC Philadelphia.  Dr. Rao testified, as she wrote in her report, that she believed Defendant had an adequate understanding of the nature and consequences of the charges against him.  (Apr. 9, 2024 Rough Hr'g Tr. at 13:2–14:7, 33:9–21, 34:22–35:5.)  As to whether Defendant could assist his counsel, Dr. Rao testified that Defendant occasionally provided irrelevant responses and that his ability to think rationally and relevantly "waxed and waned" during the course of the evaluation.  (*Id.* at 11:13–13:1.)  This inability to sustain rationality for a long period of time, paired with Defendant's mistaken belief that he would soon be released, led Dr. Rao to the conclusion that Defendant would not be able to assist his attorney. (*Id.* at 15:9–16:3.)  Regarding Defendant's medication compliance, Dr. Rao testified that at the percentage level that Defendant took his medication at MCC Chicago, which was 58% for the month of January and 16% for the month of February, the therapeutic effect could not be achieved.  (*Id.* at 8:3–13.)  However, she was unable to opine on what level of compliance was necessary for the drug to have its effect of reducing hallucinations, delusion, disorganized behavior, and disorganized thoughts.  (*Id.* at 10:10–20.)

Defendant was then asked questions by the Court regarding his understanding of courtroom procedures and what steps would follow if he was or was not found competent.  (*Id.* at 48:17–55:3.)  Defendant's answers waivered at times, and he occasionally provided incorrect answers to fundamental questions.  (*See, e.g.*, *id.* at 49:3–5 (Defendant testifying that the next step in his criminal case would be sentencing even though he has not yet been found guilty of any crime).)  However, Defendant generally stated that he understood the criminal process awaiting him and the role each individual would play.  (*Id.* at 48:17–55:3.)

## II.     Analysis

As discussed, the issue before the Court is whether Defendant is currently competent or should be committed to the custody of the Attorney General for purposes of restoring his competence pursuant to 18 U.S.C. § 4241(d).  A "fundamental" aspect of our adversarial system of justice is the prohibition against subjecting an incompetent person to trial.  *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975).  Any failure in observing this fundamental prohibition results in the deprivation of the incompetent defendant's due process right to receive a fair trial.  *Id.* at 172; *United States v. Leggett*, 162 F.3d 237, 241 (3d Cir. 1998).  An individual is deemed incompetent where "the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense."  18 U.S.C. § 4241(d).  Accordingly, the test for competency consists of the following two prongs:  (1) "whether [the defendant] has a rational as well as factual understanding of the proceedings against him," and (2) "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding."  *Drope*, 420 U.S. at 172 (internal quotation marks omitted).

In making a competency determination, the Court "must consider a number of facts, including:  'evidence of a defendant's irrational behavior, [the defendant's] demeanor at trial, and any prior medical opinion on competence to stand trial.'"  *Leggett*, 162 F.3d at 242 (alteration in original) (quoting *Drope*, 420 U.S. at 180).  Also relevant are the views of defense counsel.  *See United States v. Renfroe*, 825 F.2d 763, 767 (3d Cir. 1987).  However, "there are no fixed or immutable signs" or "predetermined formula," with which to invariably resolve the competency issue.  *Leggett*, 162 F.3d at 242.  For example, that an individual suffers from a

mental illness is not dispositive of whether they are competent to stand trial.  *Id.* at 244 ("If the mental illness does not deprive the defendant of the ability to understand the proceedings rationally as well as factually, then the illness is irrelevant for the purposes of determining competency." (internal citations, quotation marks, and alterations omitted)).  Instead, determining a defendant's competency is "often a difficult [question] in which a wide range of manifestations and subtle nuances are implicated."  *Drope*, 420 U.S. at 180.

### A.    Defendant's Understanding of the Nature and Consequences of the Proceeding Against Him

As to the first prong, Dr. Rao concluded in her report and reiterated numerous times while testifying at the competency hearing that Defendant has a sufficient understanding of the nature and consequences of the proceeding against him.  (Rpt. at 21 (finding that "[r]egarding information surrounding the nature and consequences of his charges, the defendant demonstrated adequate factual understanding"); Apr. 9, 2024 Rough Hr'g Tr. at 13:2–14:7, 33:9–21 (Dr. Rao testifying that she has no concerns about whether Defendant has a factual understanding of the charges against him).)  Based on Defendant's behavior as detailed in Dr. Rao's report and the Court's observations of Defendant during two different days of the competency hearing, the Court agrees.

Dr. Rao reports that when asked, Defendant correctly informed his evaluators that he faced "922-gun charges" and that if he was convicted, "he may be sentenced to a federal prison" with a sentence that would likely fall within the "24 to 36 month" range.  (Rpt. at 21.)  Defendant repeated these statements on the first day of his competency hearing, testifying that he was charged under 18 U.S.C. § 922 for "straw purchasing" firearms and that he could face a sentencing guidelines range of "24–36 months" imprisonment with a maximum sentence of 40

years imprisonment.[8]  (Apr. 2, 2024 Hr'g Tr. at 5:19-23, 6:13-20.)  Defendant's understanding also transcends this mere recitation of his charges and potential sentence.  Dr. Rao concluded that Defendant demonstrated an adequate "understanding of basic court-related information" and was able to provide "details about the timeline of events leading up to his arrest that were very consistent with information documented within legal records."  (Rpt at 23–24.)  The combination of these facts suggests that Defendant understands why he is before this Court, how trial would proceed, and the seriousness of a potential conviction.  *See United States v. Guess*, No. CRIM.A. 08-13 ERIE, 2009 WL 1911041, at *7 (W.D. Pa. July 1, 2009) (holding that the defendant was competent to stand trial and finding it "significant" that he was able to "meaningfully discuss the charges" with his evaluator); *United States v. Brown*, No. CRIM.A. 12-0367, 2015 WL 1573365, at *12 (E.D. Pa. Apr. 8, 2015) (holding that the defendant is competent and relying, in part, on the fact that the defendant "understands that possible penalties include prison time and restitution," could provide "a backdrop or historical context to the Government's allegations," and "understood the roles of the judge, the jury, the prosecution, and the judicial process").

The Court acknowledges that Defendant's recollection of courtroom proceedings is imperfect and his estimate of his sentencing guideline range, while consistent, may be slightly inaccurate.  But competency does not require perfection or an unfaltering memory.  *See Guess*, 2009 WL 1911041, at *7 (noting that in the context of competency, "perfection is not required").  Instead, Defendant's ability to consistently recount his charges and potential punishment along with his factual understanding of the events leading up to his arrest demonstrates that he has the

---

[8] Defense counsel asserts he actually informed his client that his guideline range would be 24–30 months with acceptance of responsibility and 33–41 months without acceptance of responsibility.  (Apr. 2, 2024 Hr'g Tr. at 17:22–18:3.)  However, Defendant was correct that that the maximum punishment he could receive for 7 counts of violating 18 U.S.C. § 924(a)(1)(A) and 1 count of violating 18 U.S.C. § 922(a)(1)(A) is 40 years imprisonment.

requisite understanding of the nature and consequences of the proceedings against him.  The Court thus agrees with Dr. Rao's finding that Defendant presently satisfies the first prong of the competency test.

### B.  Defendant's Ability to Assist in His Defense

The second prong—whether Defendant is capable of assisting counsel—is a closer call. Dr. Rao found that although Defendant was able to provide relevant answers for short periods of time, she was concerned about his ability to sustain these relevant and rational responses for longer periods of time.[9]  (Rpt. at 24; Apr. 9, 2024 Rough Hr'g Tr. at 11:13–13:1.)  This concern, paired with Defendant's strongly held belief that he would be released on bail clouding his ability to apply strategy to his case, led Dr. Rao to opine that Defendant was incapable of assisting his counsel without restoration.  (Apr. 9, 2024 Rough Hr'g Tr. at 15:9–16:3.)

While not diminishing Dr. Rao's concerns, the Court finds that Defendant's behavior as detailed in the evaluative report, as described by defense counsel, and as observed in the courtroom during the competency hearing requires the Court to conclude that Defendant is presently able to assist his counsel with his defense.  Four facts in particular lead the Court to this conclusion.

First, and perhaps most significantly, defense counsel Jonathan McDonald, Esquire, who is an experienced defense attorney that has represented Defendant for over a year, has steadfastly argued that his client is capable of assisting him in preparing a defense.  As the Supreme Court

---

[9] Dr. Rao acknowledged that her view as to Defendant's ability to sustain rational and relevant responses is limited to the period in which she observed him and that she cannot speak to his abilities today.  (Apr. 9, 2024 Rough Hr'g Tr. at 43:2–9.)  While the Court's interaction with Defendant post-evaluation has been limited to the roughly two hours during the course of the two different days of his competency hearing, the Court did not observe any instances of Defendant being unable to provide relevant or rational responses.

has previously stated, given their exposure and proximity to their clients, "defense counsel will often have the best-informed view of the defendant's ability to participate in his defense." *Medina v. California*, 505 U.S. 437, 450 (1992); *see also United States v. Metcalfe*, 698 F.2d 877, 882 (7th Cir. 1983) ("[T]he fact that the defendant's attorney believes his client is competent and able to assist counsel in defense is significant evidence that he is competent."); *United States v. Diehl Armstrong*, No. 1:07CR26, 2008 WL 2963056, at *34 (W.D. Pa. July 29, 2008) (finding defense counsel's opinion regarding client's competency significant in making competency determination); *cf. Drope*, 420 U.S. at 177 n.13 ("Although we do not, of course, suggest that courts must accept without question a lawyer's representations concerning the competence of his client, an expressed doubt in that regard by one with 'the closest contact with the defendant,' is unquestionably a factor which should be considered." (citations omitted)). Here, Mr. McDonald has repeatedly argued, both in his papers and at the competency hearing, that he and Defendant have a positive working relationship, and that Defendant both is capable of and in fact has assisted him in defending this case.  (Def. Letter Brief at 4–5; Apr. 9, 2024 Rough Hr'g Tr. at 56:5–57:10.)  Counsel's assertions are corroborated by Defendant's repeated statements to Dr. Rao that he has a positive relationship with his attorney, that he is confident in Mr. McDonald's ability to represent him, and that he intends to cooperate and work with his attorney.  (Rpt. at 23–24.)  Counsel's belief that Defendant can help him in preparing his defense and Defendant's stated intention to do exactly that weighs heavily in favor of finding that Defendant meets this prong of the test for competency.

Second, as discussed above, Dr. Rao's report details that Defendant has "an adequate degree of factual understanding of basic court-related information."  (*Id*. at 24.)  The report details how Defendant was able to correctly identify the major players in his potential trial and

what role they might play.  (*Id.* at 21–22.)  Defendant was also able to identify what a plea deal

is and successfully worked through a hypothetical case in which he had to apply these legal

principles.  (*Id.* at 22, 24.)  And perhaps even more significantly, he was able to identify

situations in which he may turn to his defense counsel for advisement, such as when he believes

the testimony elicited at trial is false.  (*Id.* at 23.)  While, as demonstrated at his competency

hearing, his understanding of the entire court process is imperfect, it appears that he has a general

understanding of what steps are next should he be found competent.  *Cf. Guess*, 2009 WL

1911041, at *2 ("Even perfectly competent defendants often do not fully comprehend the

intricacies of some of the defensive theories offered by their lawyers.  That level of

comprehension is not a requirement of competency." (quoting *United States v. Hogan*, 986 F.2d

1364, 1373 (11th Cir. 1993)).  This understanding of the legal process suggests an ability to

assist counsel in preparing his defense.[10]

---

[10] As discussed above, Dr. Rao found that while Defendant was able to understand these principles and
strategies in the abstract, he was unable to apply his understanding to his case because he was under the
mistaken impression that he would soon be released.  (Rpt. at 24; Apr. 9, 2024 Rough Hr'g Tr. at 15:9–
16:3.)  Again, the Court notes that the complicated procedural history of Defendant's case could easily
have led to confusion regarding his bail status.  Defendant was first granted bail if he could meet certain
conditions while in local custody but was then he was transferred on a writ to face his federal charges.
(Def. Letter Brief at 2; Doc. No. 4.)  Although, Defendant was again granted pretrial release, it was
conditioned on his compliance with certain local custody bail conditions.  (Doc. No. 12.)  Ultimately
Defendant failed to abide by those conditions and this Court issued a bench warrant and revoked his
pretrial release.  (Doc. No. 21.)  But this procedural complexity could have led Defendant to believe he
will soon be released.

Defendant's misunderstanding as to his release may also be attributed to two additional facts.  First, as
defense counsel detailed in his letter brief, he has advised Defendant that if he is found competent, he can
move again for pretrial release, and that defense counsel believes that this release is "conceivable."  (Def.
Letter Brief at 3.)  And second, communications between Defendant and his mother detailed in Dr. Rao's
report suggest that Defendant's mother may have been telling him he would be released once he is found
competent or that his charges would be dropped once he returns to Philadelphia.  (*See, e.g.*, at 13
(Defendant's mother saying that there is an issue with Defendant's "stable mind" and if he is "ok the
people will let [him] out of prison"); *id.* at 13–14 (Defendant's mother emailing Defendant that his
attorney informed her that "when [he] return[s] back to Philadelphia they will drop the charges by [his]
next court appearance").)  Given the overlap of his state and federal detention and the other information

Third, Dr. Rao noted in her report that Defendant understands the factual background leading to his arrest and was able to present this information in a linear fashion.  (Rpt. at 23.) Indeed, Dr. Rao even concluded that Defendant could testify relevantly if he chose to do so. (*Id.*)  Of course, Defendant's knowledge of the facts underlying his charges is insufficient on its own to find Defendant competent.  *See Dusky v. United States*, 362 U.S. 402, 402 (1960) (finding that the fact that the defendant is "oriented to time and place" and has "some recollection of events" is insufficient to establish competency to stand trial); *United States v. Rodriguez*, No. CRIMA208CR00061LDD3, 2009 WL 2929808, at *10–11 (E.D. Pa. Sept. 8, 2009) (noting that the "defendant's ability to recite the facts of his case" is one of the many considerations in a competency analysis).  But when paired with his general understanding of the legal system and his positive working relationship with counsel, this command of the factual circumstances underlying his case supports a finding that he is able to help assist his attorney and participate in strategic decision-making.  *See Guess*, 2009 WL 1911041, at *7 (holding that the defendant was competent and finding significant that the defendant was an "accurate historian" who could meaningfully discuss his charges and role in the underlying case).

And finally, the Court finds significant that some of the concerning behavior that Dr. Rao noted and relied on in her report appears to have dissipated since Defendant has returned to FDC Philadelphia.  Dr. Rao wrote in her report and testified at the competency hearing that one of the primary concerns with Defendant is his inability to take his antipsychotic medication as prescribed.  (Rpt. at 14–15; *see also* Apr. 9, 2024 Rough Hr'g Tr. at 32:2–5.)  Dr. Rao stated that this medication limits the symptoms that she believes impedes Defendant's ability to assist his attorney and that if Defendant "establishes full medication compliance, it is [her] opinion that he

---

Defendant was being provided by trusted sources, the Court finds that Defendant's misunderstanding regarding his release reveals little about his ability to assist his counsel today.

could be restored to competency." (Rpt. at 25.) But since returning to FDC Philadelphia, Defendant has been increasingly compliant with his medication requirements, raising his compliance rate from 58% and 16% during his two months at MCC Chicago to 82% in the month of April and 67% across two and one-half months since he has returned to FDC Philadelphia. (*See* Medication Records at 5–7; Apr. 9, 2024 Rough Hr'g Tr. at 45:9–12 (Dr. Rao agreeing that his compliance rate is much higher than his compliance rate at MCC Chicago).) While there is still room for improvement, and Dr. Rao was not able to provide an exact compliance rate that would provide the desired effect (Apr. 9, 2024 Rough Hr'g Tr. at 10:10–20), the Court finds this upward trajectory significant.

Perhaps relatedly, the concerning behavior that Defendant displayed during his first tenure at FDC Philadelphia and MCC Chicago, which included head banging, pacing around naked, engaging in conversation with individuals who are not present, and demonstrating aggressive or sexually inappropriate behavior with staff and his fellow prisoners, has appeared to have subsided. (*See generally* Psych Records at 1–28; Rpt. at 7–8, 11, 14.) Indeed, a review of Defendant's psychological records shows that staff believe he is "currently functioning well on a daily basis," has "no difficulties following unit rules and procedures," that there are "no concerns" about his behavior, and that he "appears to be socializing appropriately with peers." (Psych records at 2, 4, 10, 11.)[11] He has also been described as demonstrating "calm and stable" behavior (*id.* at 4) and his "memory and cognition" appear intact (*id.* at 1). These observations are consistent with Defendant's demeanor in the courtroom on both days of his competency hearing in which he presented as calm and respectful. *See Guess*, 2009 WL 1911041, at *8

---

[11] While there were limited reports of Defendant "endors[ing] auditory and visual hallucinations" when he first arrived back at FDC Philadelphia (*see* Psych records at 12, 16), the behavior Defendant demonstrated does not appear to be to as severe as what displayed while previously held at FDC Philadelphia or MCC Chicago.

(finding the defendant's demeanor at the competency hearing, in which he was composed and attentive throughout, weighed in favor of finding him competent); *cf. United States v. Jones*, 336 F.3d 245, 257 (3d Cir. 2003) (noting that, in determining whether to hold a competency hearing, the court can consider its personal observation of the defendant's demeanor in the courtroom). That Defendant's behavior has been consistently appropriate and calm since he left MCC Chicago further supports a conclusion that he is presently capable of assisting his counsel.

In sum, Defendant has demonstrated both an adequate understanding of the legal system and the factual circumstances underlying his charges. In addition, considering defense counsel's consistent position that Defendant has been and currently is capable of helping prepare his defense, and Defendant's positive trajectory with medication compliance and behavior while in custody, the Court finds that at this time Defendant satisfies the second prong of the test for competency.

\* \* \*

There is no doubt that Defendant is suffering from a serious mental illness, and the Court has witnessed firsthand just how significant and debilitating this condition can be. But having a mental illness is not the equivalent of being incompetent to stand trial. *See United States v. Nichols*, 56 F.3d 403, 412 (3d Cir. 1988) ("It is well established that some degree of mental illness cannot be equated with incompetence to stand trial."). Nor is the question whether Defendant was incompetent when the Court saw him in his agitated state on September 11, 2023. *Leggett*, 162 F.3d at 244. Instead, the proper inquiry is whether, despite his mental illness, Defendant *presently* has an adequate understanding of the nature and consequences of the proceeding against him and can help his attorney in preparing his defense. *See id.* (holding that while "a trial court may consider a defendant's history of mental illness, it must properly focus

its inquiry [on the defendant's] mental state at the time of the [proceeding]" and that "the defendant must not only suffer from a mental impairment but must also be 'presently' unable to understand the nature and consequences of the proceedings" (alterations in original)); *cf. United States v. Parker*, 127 F. App'x 614, 616 (3d Cir. 2005) (rejecting argument that Defendant was incompetent where he indicated that he was "taking the fall for actions done in concert with angels who were directing him and that 'in a hundred years it won't matter' because 'Judgment Day is close'" in part because "[t]he most troubling evidence of mental illness was too dated to reflect Parker's capacities at the time of the plea hearing").  As the record currently stands, both those questions must be answered in the affirmative.  Should that change or Defendant's condition worsen, which the Court will keep a close eye on, the Court will then reevaluate Defendant's competency and the need for restoration.[12]  *See Drope*, 420 U.S. at 181 ("Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.").

### III.  Conclusion

For the reasons set forth above, the Court finds that Defendant is competent to stand trial for the offenses detailed in his indictment.  (Doc. No. 1.)  An appropriate Order follows.

---

[12] To assist the Court's continued supervision of Defendant's condition and as set forth in the accompanying Order, the Court requests that the parties continue to receive and provide the Court with Defendant's medical records from FDC Philadelphia.  This includes both his psychological observation notes and his medication compliance records.